Pennsylvania Containers, Inc. v. Commissioner.
Pennsylvania Containers, Inc. v. Commissioner
Docket No. 94606.
United States Tax Court
T.C. Memo 1963-246; 1963 Tax Ct. Memo LEXIS 98; 22 T.C.M. (CCH) 1235; T.C.M. (RIA) 63246; September 11, 1963
Elliot Wald, Bernard P. Wald and Nathan Wald, 350 5th Ave., New York, N. Y., for the petitioner. Lee A. Kamp, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined a deficiency in petitioner's 1959 income tax in the amount of $5,651.74. In his notice of deficiency respondent explained the deficiency resulted from his determination "that the deduction claimed for officers' salaries on your income tax return for the taxable year ended May 31, 1959 in the amount of $20,000.00 is disallowed to the extent of $14,000.00, in accordance with the provision of Section 162 of the Internal Revenue Code *99 of 1954 for the reason that is deemed unreasonable." The correctness of this determination is the only issue in the case. Findings of Fact Some of the facts were stipulated and they are found accordingly. Pennsylvania Containers, Inc., hereinafter sometimes called the petitioner, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its business address at Bayonne, New Jersey. Petitioner filed its corporation income tax return for the fiscal year ended May 31, 1959 with the district director of internal revenue (Manhattan), New York, New York. Petitioner is engaged in the business of selling corrugated containers principally to manufacturers within the State of Pennsylvania for use in packing their products. The products sold by petitioner are manufactured by Kraft Corrugated Containers, Inc., owned and controlled by the same interests. Joseph Kramer is chairman of the Board and secretary of the petitioner and Saul Kramer, his son, is president thereof. The issued and outstanding stock of the petitioner is held as follows: Shares
Joseph Kramer
100
Rose Kramer (wife of Joseph)
100
Saul Kramer
160
Lola Kramer (wife of Saul)
40
*100 Joseph Kramer and Saul Kramer are also the only active officers of five other corporations wholly owned by them and their families. They are as follows: (a) Kraft Corrugated Containers, Inc.
Manufacturers of corrugated containers. (b) A B & Container Corp. A selling company engaged in the sale of corrugated containers manufactured by Kraft Corrugated Containers, Inc. Sales were to customers outside the State of Pennsylvania. (c) Normandy Container Corp. A selling company engaged in the sale of corrugated containers manufactured by Kraft Corrugated Containers, Inc. Sales were to customers outside the State of Pennsylvania. (d) Supplies, Inc. A company engaged in the manufacture of ink and supplies, which it sells to Kraft Corrugated Containers, Inc. and others. (e) Karo Realty Co., Inc. A real estate corporation which owns premises occupied by the above-named companies. Kraft Corrugated Containers, Inc. also had interests in the following container corporations: (a) Connecticut Container Corp. Manufacturer of containers from corrugated board, located in North Haven, Connecticut, principally supplied by Kraft Corrugated Containers, Inc., selling to D L & D *101 Container Corp. but also selling to consumers directly. Common Stock Ownership
Kraft Corrugated Containers,
Inc.
165 3/4 shares
Lawrence Perkins
159 1/4 shares
Total
325 shares
(b) D L & D Container Corp. A selling company located at North Haven, Connecticut, engaged in the sale of corrugated containers manufactured by Connecticut Container Corp. A wholly owned subsidiary of Connecticut Container Corp. (c) Mid-Hudson Container Corp. A manufacturer of containers from corrugated board located at Hopewell Junction, New York, principally supplied by Kraft Corrugated Containers, Inc.
Common Stock Ownership
Kenneth and Arils Luckens
225 shares
Kraft Corrugated Containers, Inc.
75 shares
Total
300 shares
Petitioner employs one regular salesman, Jack R. Wallner, who in 1959 received commissions of $5,758.68 and mileage expenses of $1,092. Other commissions paid amounted to $5,545.92 and mileage expenses $200.83. The sales orders obtained by the petitioner's salesman, Jack R. Wallner, in Pennsylvania, were forwarded to Bayonne, New Jersey. The containers were shipped by Kraft for the account of the petitioner and the petitioner *102 was billed for cartage charges. No inventories were carried on the books of Pennsylvania Containers, Inc. For the fiscal year ended May 31, 1959, the petitioner sold $280,182.90 worth of merchandise acquired from Kraft Corrugated Containers, Inc. at an average markup of 30 percent above cost, for $362,531.01, for a gross profit of $82,348.11. No dividends have been paid by petitioner since its incorporation in 1945. The following table shows the taxable income, compensation of officers, and salaries (including salesmen's commissions) shown on the income tax returns for the petitioner for the 10 fiscal years from 1950 to 1959, inclusive: Salaries (In-
Fiscal Year
Taxable
Compensation of Officers
cludes Salesmen's
Ended May 31
Income
J. Kramer
S. Kramer
Commissions) *
1959
$17,598.83
$11,000
$ 9,000
$14,680
1958
11,696.71
11,000
9,000
17,433
1957
11,845.73
11,000
12,000
17,565
1956
24,135.81
11,000
12,000
22,304
1955
22,168.35
11,000
12,000
20,893
1954
18,293.41
11,000
12,000
19,264
1953
24,604.87
11,000
12,000
23,407
1952
28,996.80
11,000
12,000
19,438
1951
38,419.63
11,000
12,000
26,125
1950
14,274.80
11,000
12,000
16,971
*103 The following is a statement compiled from the tax returns of corporations related to the petitioner for years ended in 1959: Salaries Paid
Gross
Taxable
to J. & S.
Other
Sales
Profit
Income
Kramer
Salaries
Kraft Corrugated
$6,191,333
$824,507
$155,686
$50,000
$209,766
Containers, Inc.
A B & Container Corp.
4,499,597
363,053
138,762
50,000
119,337
Normandy Container Corp.
502,166
67,411
21,856
6,000
21,006
Supplies, Inc.
97,518
67,505
19,704
7,600
26,127
Karo Realty Co., Inc.
None
170,317
105,491
None
None
The following is a statement compiled from the tax returns of the corporations in which Kraft Corrugated Containers, Inc. held an interest for the year ended in 1959: Compen-
Salaries
sation
Paid to
to Other
Gross
Taxable
J. & S.
Corporate
Other
Sales
Profit
Income
Kramer
Officers
Salaries
Connecticut Container
$2,000,179
$318,837
$21,012
$3,120
$17,500
$104,013
D L & D Container
242,659
38,186
4,888
None
12,500
7,450
Mid-Hudson Container
242,909
44,996
6,869
None
15,720
11,937
*104 Opinion Section 162(a)(1) of the Internal Revenue Code of 1954 allows a deduction for all ordinary and necessary expenses paid or incurred in carrying on a trade or business including "a reasonable allowance for salaries or other compensations for personal services actually rendered." There is no question here but that petitioner's officers actually rendered personal services for petitioner in 1959. Respondent's adjustment would allow the compensation paid to them for said services as a deduction in the amount of $6,000. The only issue is whether $20,000, the actual amount petitioner paid its officers, was reasonable. The issue is one of fact. In many cases presenting the same issue under section 162 of the Internal Revenue Code of 1954 the courts have held consideration should be given to such factors as the employee's qualifications; the size and complexities of the business; a comparison of salaries paid with gross income and net income; comparison of salaries with other distribution to stockholders; compensation with comparable positions in comparable concerns; and in the case of small corporations with a limited number of officers, *105 the amount of compensation paid to the particular officers in previous years. J. J. Hart, Inc., 9 T.C. 135, p. 141. Saul Kramer was the only witness in the case. His father was in Florida, where he goes each winter for his health. Saul testified that the family container business was started by his father over half a century ago with no capital. Saul entered the business with his father some 20 years later. The business progressed until now their business is a multimillion dollar enterprise. Their expansion took the form of acquiring other container corporations that were not prospering and sometimes starting other corporations in neighboring states. Petitioner was originally started by the Kramers to design and sell shipping containers in the State of Pennsylvania. Saul testified that the original plan was to have a container manufacturing operation in that state a little later. When their Connecticut company (controlled by Kraft) developed its container manufacturing operation, the plan to have a Pennsylvania container manufacturing operation was abandoned. The type of containers that the Kramers manufactured and sold through their various multi-corporation operations *106 is a tailor-made shipping container. It is designed specially as a shipping container for a purchaser's product and it is specially constructed and manufactured to fit the needs of a purchaser. In their business no two containers are alike and no stock or inventory of containers or boxes is kept. Saul testified that he and his father "are in charge of the entire sales of the company. We handle * * * close to 40 to 50 percent of the actual sales of this company on a direct basis." He said the officers called on various accounts, interviewed and hired salesmen and saleswomen, and supervised their sales activities, and discharged them when they could not produce. During 1959 the officers made a profitable connection with a large paper company in Philadelphia that was engaged in shipping supplies to manufacturers. They succeeded in getting this company to handle petitioner's products on a commission basis but this meant Saul or his father would have to go with that company's salesmen to call on their accounts. "I would have to do a lot of the leg work. Sometimes I wasn't there and my dad had to do it." Saul testified that petitioner's operations were comparable in size and scope to *107 their related Normandy Container Corporation, which they took over in 1954 or 1955, which prior to its acquisition by the Kramers, paid its officers $40,000. He explained that he and his father only received a total of $6,000 from Normandy because the former owners continued their same work so the present officers' duties were mainly advisory. Respondent argues Saul's testimony was self-serving and vague. It is true Saul could not state the number of hours he and his father worked for petitioner on an average day. Three or four of their related corporations of which Saul and his father were officers had the same Bayonne office and part of each day's work might be for other corporations. Saul's testimony is somewhat corroborated, at least with respect to the officers' sales activities. The record shows salesmen were paid a commission of 5 percent plus nominal amounts for travel and expenses. It is stipulated that petitioner had sales of $362,531.01 and that the company paid salesmen's commissions of a total of $11,304.60, which is some $7,000 less than 5 percent of sales. The record indicates there were some old accounts on which commissions were probably not paid but the record furnishes *108 some indication of sales activities by the officers. We feel Saul's testimony should be accepted and that on the whole record petitioner sustained its burden of establishing the reasonableness of its $20,000 salary payments for officers. The record shows the officers' salaries had been fixed some 10 years before the year in question. The record indicates such salaries never had been geared to income or profits so the factor of various ratios of total salaries to total income is not of much significance here. The officers' salaries did not vary much from year to year and the fluctuation there seems to have been based more on the services required by petitioner. Saul's salary was actually reduced by $3,000 for 1958 and 1959 and he explained the reduction by saying he worked less for petitioner during those years than he had in former years. He also explained that no dividends were being paid because they felt that ultimately they would have to own the basic raw material product which went into their manufacturing of containers. They were accumulating all the money they could to make an investment that would be in the millions for a corporation that had already been formed for the construction *109 of a paper mill. It is true the officers and their families owned all of petitioner's stock and the officers here were officers of other corporations that they or their families owned or controlled. This means there must be close scrutiny to see that the salaries were, in fact, reasonable compensation. It means the officers were in a position to act to have the corporation make earnings distributions disguised as salary. It means the officers could act to have their multi-corporation structure pay salaries to them designed to absorb all or most all of the income of the corporations with the objective of minimizing or eliminating the income tax liability of their various corporations. We think the required close scrutiny reveals nothing that would indicate the $20,000 salary payments to officers were unreasonable for the services they performed. It must be admitted the salaries were for the services of experienced, highly qualified men in the industry. Respondent really only disputes the quantity of services they rendered petitioner. Admittedly they supplied capable managerial services. We feel they also supplied some sales services. The salaries do not appear to be unreasonable *110 for the services of such well qualified men. The fact that they were stockholders is unimportant unless the salaries were unreasonable. Eitel-McCullough, Inc., 9 T.C. 1132, p. 1149. The fact that the salaries remained so nearly constant for at least 10 years, while income was ranging from $11,000 to $38,000, does not indicate a plan to minimize corporate income by salary payments. We hold for petitioner. Decision will be entered for the petitioner. Footnotes
*. The stipulation indicates the commissions paid to salesmen reflected as salaries on the prior returns may include mileage expenses not to exceed $2,000.↩